Filed 8/18/25  P. v. Villanueva CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICARDO VILLANUEVA,<br><br>    Defendant and Appellant. | H051098<br>(Monterey County<br> Super. Ct. No. S102330B) |

In 2013, teenage defendant Ricardo Villanueva pleaded no contest to attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664) and street terrorism (§ 186.22, subd. (a)).  Villanueva further admitted a gang enhancement allegation (§ 186.22, subd. (b)(1)) and a firearm enhancement allegation (§ 12022.53, subds. (c), (e)).  The trial court sentenced Villanueva to an aggregate term of 25 years in state prison.  (See *People v. Villanueva* (Jan. 19, 2023, H049951) [nonpub. opn.] (*Villanueva*).[2])

---

[1] All further unspecified statutory references are to the Penal Code.

[2] This court previously granted Villanueva's request for judicial notice of the opinion in his prior appeal related to the same section 1172.6 proceeding at issue in this appeal.

In 2022, Villanueva filed a petition under section 1170.95 (now section 1172.6) asking the trial court to vacate his attempted murder conviction and resentence him (petition). The court denied Villanueva's petition at the prima facie stage, and Villanueva appealed. (*Villanueva, supra,* H049951.)

In 2023, a different panel of this court reversed the trial court's denial of Villanueva's petition and remanded with instructions for the court to hold an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3). (*Villanueva, supra,* H049951.)

In June 2023, following an evidentiary hearing, the trial court concluded the prosecution had proved Villanueva could be convicted of attempted murder under current law.

Villanueva now appeals the trial court's denial of his petition, claiming there was insufficient evidence that he directly aided and abetted attempted murder and the trial court misunderstood the elements of direct aiding and abetting. Additionally, Villanueva claims that even if the evidence is sufficient, his defense counsel provided constitutionally ineffective assistance at the evidentiary hearing.

For the reasons explained below, we reverse the trial court's denial of Villanueva's petition because the evidence presented at the evidentiary hearing is insufficient to conclude, beyond a reasonable doubt, that Villanueva directly aided and abetted attempted murder. We direct the trial court to grant Villanueva's petition, vacate his attempted murder conviction, and resentence him.[3]

---

[3] In addition to filing this appeal, Villanueva, through his appellate counsel, has filed a petition for writ of habeas corpus alleging a claim of ineffective assistance of defense counsel related to the evidentiary hearing. This court ordered that the habeas corpus petition be considered with this

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

    1. <u>Charges, Plea, and Sentence</u>

In May 2011, the Monterey County District Attorney filed an amended information against Villanueva and a codefendant, Jesse Estrada Diaz. As to Villanueva, the information alleged first degree murder (§ 187, subd. (a); count 1), attempted premeditated murder (§§ 187, subd. (a), 664; count 2), and street terrorism (§ 186.22, subd. (a); count 3). The information further alleged gang enhancement allegations (§ 186.22, subd. (b)(1)) on counts 1 and 2. (See *Villanueva, supra,* H049951.)

In October 2013, Villanueva pleaded no contest to attempted murder (without premeditation) (count 2, as amended) and street terrorism (count 3). In addition, as to count 2, Villanueva admitted the gang enhancement allegation and a firearm enhancement allegation (§ 12022.53, subds. (c), (e)). In exchange for his plea, the remaining first degree murder count would be dismissed and a stipulated sentence of 25 years in state prison would be imposed.

The trial court sentenced Villanueva to a total term of 25 years in prison, consisting of the lower term of five years for attempted murder (count 2) plus a consecutive term of 20 years for the firearm enhancement. (See *Villanueva, supra,* H049951.[4])

---

appeal, and we have disposed of that petition by separate order filed this day in case No. H052998.

    [4] Neither our prior opinion nor the present appellate record specifies a term imposed for count 3 (street terrorism).

2. <u>Section 1172.6 Proceedings</u>

    a. Petition and Prior Appeal

In 2019, in Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), the Legislature acknowledged "a need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § 1, subd. (b) [eff. Jan. 1, 2019].) To that end, "Senate Bill 1437 significantly changed the scope of murder liability for defendants who did not actually kill or intend to kill anyone, including those prosecuted on a felony-murder theory." (*People v. Wilson* (2023) 14 Cal.5th 839, 868 (*Wilson*).) "The bill also altered murder liability under the natural and probable consequences doctrine." (*Id.* at p. 868, fn. 8; see § 188.) Further, the Legislature added section 1170.95 (now designated as section 1172.6), allowing a person convicted of felony murder or murder under the natural and probable consequences doctrine to file a petition with the sentencing court to vacate the conviction and be resentenced. (Stats. 2018, ch. 1015, § 4.)

Three years later, in Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), the Legislature "[c]larifie[d] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1, subd. (a) [eff. Jan. 1, 2022]; see also *id.*, § 2 [amending former § 1170.95].)

In January 2022, Villanueva filed a petition seeking vacatur of his attempted murder conviction and resentencing. The trial court denied the petition at the prima facie stage without issuing an order to show cause. (See *Villanueva*, *supra*, H049951.) Villanueva appealed.

In January 2023, this court concluded that Villanueva's petition had presented a prima facie showing of entitlement to relief under section 1172.6 and that nothing in the record established as a matter of law that Villanueva was ineligible for that relief. This court accordingly reversed the trial court's order and remanded with directions for the court to issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3). (See *Villanueva, supra*, H049951.)

b. Evidentiary Hearing and Ruling

On June 1 and 2, 2023, the trial court held an evidentiary hearing on Villanueva's petition. The prosecution and the defense presented testimony from several witnesses.

On June 2, 2023, after hearing final arguments from the parties, the trial court denied Villanueva's petition. The court concluded that Villanueva "could be convicted under the current state of the law." The court added that "although [Villanueva was] not the actual killer,[5] . . . with the intent to kill, he aided, abetted and assisted the actual killer in the commission of the attempted murder" of N.Z.[6]

---

[5] We understand the trial court's use of the term "actual killer" in this context of attempted murder to mean the actual shooter (i.e., Diaz).

[6] We recount *post* (see pt. II.B.) the findings that the trial court stated in support of its ruling.

B. *Evidence Presented at the Section 1172.6 Evidentiary Hearing*

   1. <u>Prosecution Evidence</u>

      a. October 1, 2010[7] Shooting

Victim N.Z.[8] testified that on the evening of October 1, when he was 21 years old, he and two friends (Jaime Steven Guerrero and A.L. (whom N.Z. called "El Pelon")) gave a ride to a young woman and her toddler. Around 7:00 p.m., they stopped outside a house on Key Street in Salinas. N.Z. and A.L. walked the woman and her toddler up to the house, while Guerrero waited by the car. A.L., the woman, and the toddler entered the house.

As N.Z. was walking back to the driver's side of his car (which was the side closest to the curb), he saw two men (later identified as Villanueva and codefendant Diaz) walking on the sidewalk toward him and the front end of his car. N.Z. testified that the men were walking "normal," and he did not see "anything suspicious."

When the men were about three meters away from the front end of N.Z.'s car, N.Z. observed both men leave the sidewalk at the same time, walk into the street, and approach the passenger's side of the car, where Guerrero was standing. The men were about "a meter" apart from each other.

N.Z. initially testified that prior to any shooting, neither Diaz nor Villanueva said anything. When the prosecutor subsequently asked N.Z. if he recalled previously telling a police officer (on the day of the shooting) that

---

[7] Unless otherwise indicated, all dates were in 2010.

[8] We refer to the victim of the attempted murder and the civilian witnesses by their initials to protect their personal privacy interests. (Cal. Rules of Court, rule 8.90(b)(4), (10).)

one of the men said " 'East Market, motherfuckers,' " N.Z. answered, "I believe so. I don't remember that well because I've tried to forget all of that."[9]

N.Z. saw that Diaz was holding a handgun. Diaz shot Guerrero three times in the head, causing him to fall "instantly" onto the street.[10] When Diaz shot Guerrero, Villanueva (like Guerrero and Diaz) was on the passenger side of the car, "but he was in the backseat area of it."

After shooting Guerrero, Diaz "walked two or three steps to shoot at" N.Z., moving around the front end of the car toward N.Z. and the sidewalk. Villanueva remained in the street and moved toward the back of the car, "behind the trunk." The men were moving "at a high speed, very fast, everything fast."

Diaz shot N.Z. on the side of his arm and the bullet hit N.Z.'s spine. N.Z. fell to the ground and he could not feel his legs. N.Z. attempted to get away using his hands but could not do so. While this was happening, Villanueva "went to the side behind the car." Villanueva "was getting closer [to N.Z.], but he was also like two meters away." N.Z. testified further that when Diaz shot him, "One went to the front of the car, and the other one who didn't shoot went to the trunk of the car." N.Z. also answered "Yes" when asked if Villanueva was "coming around the trunk of the car when you were shot."

---

[9] On cross-examination, N.Z. further testified that he had forgotten about the " 'East Market, motherfuckers' " statement, but he believed it was Diaz who said that. N.Z. also testified that Diaz "shouted" at Guerrero before shooting him.

[10] A coroner's detective testified to seeing " 'at least two separate gunshot wounds,' " one on the back of Guerrero's head and another on the middle of his back.

When Villanueva "saw that [Diaz] took off running" after he shot N.Z., Villanueva "started running." Villanueva did not say anything to Diaz or N.Z., and Villanueva did not try to help N.Z.

N.Z. testified to feeling that Villanueva restricted his (N.Z.'s) movements. N.Z. explained, "To [Villanueva's] presence [*sic*], I felt that he was like trying to impede, uh, like the movement to try and go." Villanueva was approximately "two meters" away from N.Z. when N.Z. felt that Villanueva was trying to prevent him from moving away. The prosecutor asked N.Z. if there was "anything about the way [Villanueva] had his body that made [N.Z.] feel [Villanueva] was trying to impede [N.Z.'s] movements, other than that [Villanueva] was standing in the direction you were trying to go." N.Z. answered, "No. Because I didn't get to see all his body because he was behind where the [car's] trunk was." N.Z. further testified that Diaz and Villanueva were trying to block him (N.Z.) from "going in either direction."

Diaz and Villanueva ran from the scene toward Paloma Street (in the direction of their original path of travel). When they reached the corner of Key and Paloma, Diaz turned around and shot N.Z. again in the knee.

The bullets fired at N.Z. caused pain and complete loss of the use of his legs. N.Z. cannot walk and uses a wheelchair.

b. Police Investigation

Salinas Police Department Officer Gabriel Gonzalez responded to the scene of the shooting that evening. As part of his investigation, Officer Gonzalez searched the house on Key Street, where the shootings occurred. The search revealed indica associated with the Sureño criminal street gang, including graffiti on a headboard with the words " 'most hated' " and " 'Vagos,' " a "fairly active" subset of the Sureños in Salinas. Gonzalez explained that in 2010, violence between the Sureño and Norteño gangs in

8

Salinas (including murders) was a pervasive problem. The Salinas Police Department created two separate gang units to address the significant amount of violence. Gonzalez further testified that this gang violence was highly publicized in the local news, and that he had many discussions with members of the community about the violence and issues occurring in their neighborhoods.

Ernesto Sanchez, a former officer of the Salinas Police Department, also responded to the scene of the shooting. On his arrival, Sanchez observed two men lying on the ground near N.Z.'s car. N.Z. "was laying [*sic*] to the rear of the vehicle partially under the trunk area" and "moving." Guerrero was by the front passenger's side door, not moving. Sanchez spoke to N.Z. and saw that N.Z. was bleeding on his upper chest and legs. N.Z. told Sanchez that the shooter had said "something about 'East Market' " and "shooting them in the face, or something to that effect" prior to shooting. N.Z. also said "he thought that they 'seemed like trouble' " and "that they might be wanting to steal the car from him." Sanchez attempted to speak with Guerrero, but he was nonresponsive and not breathing. Guerrero was wearing high-top sneakers, a portion of which was red—a color that Norteños sometimes use to identify themselves. In addition, there was a black and red 49ers knit cap (with blood on it) on the ground next to Guerrero.

Former Salinas Police Department Detective Brian Canaday responded to the scene of the shooting and interviewed A.L. (the person whom N.Z. referred to as "El Pelon"). A.L. admitted that he was a member of the Sureños, specifically the Vagos subset. A.L. also said he was inside the house when the shootings occurred and did not come out until after he heard the gunshots.

9

Video surveillance footage from a market located approximately one-third of a mile from the crime scene showed that Villanueva and Diaz had been inside the market shortly before the shooting. N.Z. viewed the video footage two to three days after the shooting and identified Villanueva and Diaz as the men involved in the shooting, based on their clothing.

Three days after the shooting (on October 4), Detective Canaday located a MySpace social media page that displayed Villanueva's name and picture on the main "face" page of the account. Although the account was "set to private," Canaday observed that Villanueva's first name, Ricardo, had the numbers one and four in it, which Canaday found significant because of the Norteño gang's association with the number 14. The page also contained a slogan post stating: " 'Posted up on the East Side with Semsters.' " From his training and experience, Canaday recognized this statement as an indication that Villanueva was associating with members of the Salinas East Market subset of the Norteño gang, known as "Semsters."

The police arrested Diaz on October 7. Salinas Police Department Detective Rodolfo Roman observed that Diaz had several tattoos associated with Norteño gangs. Diaz's tattoos included "a very fresh," healing tattoo across his abdomen with the letters "S-E-M," an acronym for a Salinas subset of a Norteño gang. Detective Roman testified that it was common for gang members to get new tattoos after murders or shootings took place, as members had to "put in work" to earn tattoos signifying their membership in the gang.

On October 7, the police executed a search warrant on Villanueva's residence. Officers discovered a shoe box in Villanueva's bedroom covered with words and writing associated with Norteño gangs, including words specific to the Salinas East Market subset. Officers also discovered a Rubik's

cube that had been altered to depict the number 14, items of red clothing, and a CD that had a symbol typically associated with Norteños on it.

c. Villanueva's Arrest and Police Interview

The police arrested 15-year-old Villanueva on October 7. Villanueva waived his *Miranda*[11] rights and was interviewed by Detectives Canaday and Roman. A recording of the interview was played during the evidentiary hearing.

During the police interview, Villanueva initially denied knowing anything about the shooting and claimed that he was hanging out with friends all weekend on the east side of Salinas. He acknowledged that "a lot of people get shot in Salinas . . . especially around the east side." When the detectives showed Villanueva surveillance footage from the market, Villanueva stated that he and Diaz had been dropped off at Diaz's friend's house nearby and had gone to the market to buy chips. Through the rest of the interview, Villanueva maintained repeatedly that he and Diaz (who was older than Villanueva) walked from the market directly back to Diaz's friend's house. Villanueva also repeatedly denied he and Diaz were involved in the shooting. Villanueva admitted that he had heard sirens while in the area, but he denied hearing any gunshots.

Villanueva described Diaz as a friend and said they hung out together "[e]very weekend." When asked about gang involvement, Villanueva indicated that he associated with Norteños, but he did not label himself as one and said he had never joined or been "jumped" into a gang. He also noted that if he were sent to jail, he would prefer to be housed with Norteños as they would "have [his] back." Villanueva indicated that he did not associate with Sureños because a Sureño killed his cousin in 2006. He knew of the

---

[11] *Miranda v. Arizona* (1966) 384 U.S. 436.

rivalry between Norteños and Sureños and admitted that he had gotten into a fight with a classmate who identified as a Sureño because the classmate thought Villanueva was a Norteño.

### d. Evidence of Prior Bad Acts and Gang Affiliations

The prosecution introduced evidence that Villanueva had gotten into a fight with a fellow student in 2008 while he was in middle school. Former school resource officer Valentin Paredez interviewed Villanueva at his home after the fight.[12] Villanueva claimed that the other student had asked him if he " 'banged,' " to which Villanueva responded, " 'Fuck you.' " When the other student called Villanueva a " 'buster,' " Villanueva responded by calling the student a " 'scrapa,' " and the two began fighting. Officer Paredez noted that from his training and experience, " 'buster' " was a derogatory term used by Sureños to insult Norteños, while " 'scrapa' " was a disrespectful term used by Norteños towards Sureños. Villanueva also informed Paredez he (Villanueva) had gang-related items in his room. Paredez searched Villanueva's room and discovered music CDs from Norteño rap groups, as well as a backpack with a Northern Star, which is a symbol associated with the Norteño gang. Villanueva additionally admitted knowing "that gang members commit drive-by shootings, they commit homicides, they rob people and they fight."

On cross-examination, Officer Paredez acknowledged that there was no indication that Villanueva's 2008 fight involved a weapon and Villanueva never indicated he had engaged in any of the types of crimes he ascribed to gang members. In addition, Paredez confirmed that Villanueva had said he was not a gang member and his friends were not gang members.

---

[12] Officer Paredez testified that prior to the interview, he read Villanueva his *Miranda* rights and Villanueva agreed to speak to Paredez.

The prosecution introduced evidence that in 2009, Diaz admitted to police that he had been a Norteño since the seventh grade and was a member of the Salinas East Market (SEM) subset.  Diaz also admitted in 2009 that he had recently killed a Sureño, indicating that " '[i]t felt good and it felt even better because it was a Sure[ñ]o.' "

e.  Gang Expert Testimony

Salinas Police Department Officer Austin Scaggs testified as an expert in the investigation of Norteño gang-related crimes.  Officer Scaggs indicated that the Norteño gang had a "very larger presence" in Monterey County.  Scaggs identified certain symbols typically associated with Norteños, including the following:  (1) the color red; (2) the number 14, correlating with N being the fourteenth letter of the alphabet, which could be represented through the Roman numerals XIV, the Mayan numeral of four dots and two bars, or one dot and four dots; (3) the Huelga bird, derived from the United Farmworker's Union flag; (4) the term "Norte"; and (5) the letter N in either English or Spanish.  Scaggs explained that Norteños and Sureños are rivals and the year 2010 involved significant violence between Norteños and Sureños in Salinas, including a large number of shootings.

Based on his review of the case, Officer Scaggs opined that in October 2010, Diaz was an active member of the Salinas East Market Street subset of the Norteño gang.  Scaggs reached this conclusion based on Diaz's tattoos, particularly the "SEM" tattoo on Diaz's stomach that was fresh at the time of his arrest.  Scaggs noted that an "SEM" tattoo on the abdomen was typically earned by killing Sureños.

Regarding Villanueva's gang status, Officer Scaggs opined that in 2010, Villanueva "assisted the gang by working with the shooter in this case to accomplish the goal of killing a perceived Sure[ñ]o gang member at the time."

13

Scaggs added that it seemed to him Villanueva "was coming up in the ranks and trying to establish himself in the gang, and hopefully be granted a membership. Seemed like more the hang around or associate at that time. And until the crime is committed, that's how you kind of earn your stripes."

When presented with a hypothetical situation mirroring the circumstances of the instant crime, Officer Scaggs opined that the shooting was committed for the benefit of the Norteño street gang, noting that the purpose of shooting a Sureño is to allow Norteños to gain control of an area by instilling fear and intimidation within the community. Scaggs explained that by saying " 'East Market, motherfuckers,' " the shooter was identifying himself as a member of the East Market Norteño gang and challenging another individual. Scaggs further opined that a person in Villanueva's position, whose actions served to block a perceived Sureño's escape, demonstrated the specific intent to aid a gang member in the shooting, because such action "seemed like a tactical kind of plan" so the shooter "could hopefully finish and kill the second person."

The prosecution introduced evidence about several predicate crimes committed by individuals who Officer Scaggs opined were Norteño gang members based on his review of police reports and rap sheets.

On cross-examination, Officer Scaggs acknowledged that the only known Sureño member present at the instant crime was inside the house, and that there was no evidence that the two victims were Sureños. There also was nothing visible outside the Key Street house that tended to show it was Sureño-affiliated.

The prosecution presented no evidence that Villanueva had ever been seen with a gun, that Villanueva had ever seen Diaz with a gun previously, or

14

that Villanueva had any knowledge that Diaz possessed a gun as they approached Guerrero and N.Z. on Key Street.

       2. <u>Defense Evidence</u>

           a. Villanueva's Testimony

Villanueva testified that from 2006 (when his cousin was killed) to 2010, he did not harbor an intent to kill Sureños. In 2010, Villanueva had a "lot of freedom" and was able to do "more or less what [he] wanted," including smoking marijuana and drinking alcohol. Although he got into fights at school and juvenile hall, he never used a weapon and did not ever own a weapon. He indicated that his circle of friends at the time included both gang and non-gang members, but he noted that he "slowly was going down the wrong path" by hanging out with Norteños. Villanueva first became friends with Diaz in 2006 or 2007 and continued his friendship with Diaz during the ensuing years, including visiting Diaz's house from 2009 onward. Villanueva testified that he and Diaz would generally meet up to smoke, go to parties, and drive around town to meet girls, but they would sometimes get into trouble and fights while going around town. Villanueva was aware of Diaz's association with gangs.

Villanueva testified that on the day of the shooting (October 1), he had gone home after attending school in the morning and then was picked up by his friend, Orlando. Villanueva and Orlando picked up Diaz and went to another friend's house on Dennis Street in Salinas, where they began smoking and drinking. Villanueva and Diaz later decided to walk to the market to buy chips and cigarettes. During this time, Villanueva did not see any weapons (including any gun) or have any discussions about hurting or shooting people.

15

Villanueva explained that while he and Diaz were walking back from the market, they took a wrong turn from Toro Street onto Key Street (instead of turning at the next street, which would have gotten them back to Dennis Street). As they approached N.Z.'s car, Villanueva observed Diaz pull away from him and walk toward the passenger's side of the car. Villanueva kept walking on the sidewalk past N.Z. Villanueva then heard Diaz say " 'East Market' " and knew that someone was about to be shot. Villanueva walked toward the back of the car and ducked down. He realized Diaz had a gun when he (Villanueva) "heard the pops" as he walked. He did not run because he felt a "mixture of just shock, kind of freezing up," and he was focused on trying to get to a place where he would not get shot. Diaz said " 'let's go' " to Villanueva because Villanueva "was frozen" and "looking back at the scene."

Villanueva claimed that he did not want anyone to die or get hurt and did not have an agreement with Diaz to hurt someone. Villanueva denied blocking N.Z. from getting to safety. Villanueva also testified that he did not believe N.Z. and Guerrero were gang members. When asked why he lied during his October 2010 police interview, Villanueva stated that he had "just accepted everything already because [he] just realized what everything happened [*sic*]." He continued, "And I was still . . . basically figuring out life. And I thought, man, this is just something I got to accept now."

On cross-examination, Villanueva acknowledged that he had previously told a probation officer (during his probation interview) that " '[t]he victims appeared to be gang members themselves based on the way they dressed and looked.' " Villanueva added, "I don't really know why I said it at the time, but I know I said it then." Regarding N.Z.'s testimony that Villanueva and Diaz together approached the passenger side of the car where Guerrero was standing, Villanueva testified, "I know for sure I walked on the sidewalk

16

pretty much to the back of -- around the back of the car." Villanueva added that "everything was quick" and "I know I didn't walk that way [to the passenger side of the car]. At least I don't remember walking that way." Villanueva acknowledged knowing that gang members are frequently armed, but he had not previously seen Diaz with a firearm. Villanueva testified that after the shooting, he and Diaz went back to the house on Dennis Street, left the gun there, and went to Diaz's house. Villanueva did not tell the police about Diaz's actions because of loyalty to his friend.

### b. Character Evidence

Villanueva's parents, R.V. and L.V., testified that Villanueva was a normal, "adventurous" kid, who was very lovable and loved having pets, but who would get bullied in school on occasion because of his weight. Neither parent ever saw Villanueva use any weapons or guns, and R.V. indicated that no weapons were present in their home. L.V. and R.V. testified that Diaz, who was the boyfriend of Villanueva's friend's sister, began spending time with Villanueva approximately six months before the shooting took place. Both parents noted that Diaz spent a significant amount of time at their home and was always very respectful toward them; he also never gave them any indications that he was involved in a gang or possessed weapons of any kind. R.V. further testified that in the time since the shooting, Villanueva had turned into an "awesome man" and was very responsible and honest.

Two of Villanueva's former teachers provided testimony regarding Villanueva's past behavior. Villanueva's former English teacher, N.B., testified that in March 2010, Villanueva got into a fight with another student during her class and no weapons were involved. N.B. indicated that Villanueva, who she described as a "big freshman" weighing between 250 and 300 pounds, got up from his seat, approached the other student, and began

17

punching him without any apparent provocation.  N.B. attempted to break up the fight but was unable to do so by herself.

Villanueva's former juvenile hall teacher, D.D., testified that he met Villanueva when he (Villanueva) was 15 and knew him for approximately three years.  D.D. described Villanueva as polite and quiet and said Villanueva always followed the rules and did his work.  D.D. did not know Villanueva to be violent or have any weapons during his time in juvenile hall.  D.D. thought Villanueva was "as honest as any teenager can be at 16 or 17 years old."  On cross-examination, D.D. acknowledged that he was aware of Villanueva's involvement in a physical altercation with another student.  D.D. further noted that his students were separated by affiliation, including "perceived or admitted" affiliations, and stated that Villanueva was separated into the Norteño affiliation.

c.  Expert Witness Testimony

Forensic psychologist Carolyn Murphy testified as an expert in psychology and adolescent brain development.  Dr. Murphy explained that juvenile brains undergo a significant change at approximately age 12, with an increased push toward novelty and sensation seeking, resulting in more impulsivity and risk-taking.  Murphy noted that at this same age, the prefrontal cortex (which is responsible for decision making, problem solving, inhibiting impulses, and anticipating the reasonably foreseeable consequences of one's actions) is "barely starting" its development.  That development does not finish until the middle to later 20s.  Murphy explained that adolescents are unable to fully foresee the consequences of their choices, even if they have experiences and are more emotionally mature or savvy than the "average sheltered . . . suburban kid."

Dr. Murphy further explained that frequent and heavy use of cannabis can inhibit or suppress prefrontal development in adolescents, which may cause them to be developmentally behind their peers until they discontinue use. Murphy noted that if an adolescent is using cannabis to manage anxiety or avoid boredom, such use could lead to a stunting of emotional development and practical problem-solving skills, which the adolescent may never "catch up" on even after discontinuing use. Murphy explained that "[p]eople can't be more advanced than biology allows them to be" and "even if someone is very very high intellect, their prefrontal cortex is still their prefrontal cortex. It's commensurate with intellect, but it's not necessarily more advanced, more mature."

On cross-examination, Dr. Murphy acknowledged that she did not evaluate Villanueva when he was 15 years old (around the time of the 2010 crime) and, thus, she could not speak directly as to his mental state at that age. Murphy also opined that a 15 year old would definitely know the difference between right and wrong (unless they were "cognitively incapacitated or psychotic") and would have the capacity to develop an intent to kill.

Forensic psychologist Thomas Reidy testified that he had evaluated Villanueva in 2013 and noted in his report a substance abuse disorder based on Villanueva's report of "abuse of alcohol starting . . . in about the ninth grade or so and also some marijuana abuse." Dr. Reidy's report also noted that Villanueva had "average intelligence," was "very cooperative," and did not "display any evidence of real mental illness or disturbance of any kind."

## II. DISCUSSION

Villanueva contends there was insufficient evidence to support the trial court's conclusion that he could be convicted under current law as a direct

19

aider and abettor for attempted murder.  He further argues that the court misunderstood the elements of direct aiding and abetting liability for attempted murder and thus erred as a matter in law in finding that the actus reus and mens rea had been satisfactorily proven by the evidence presented.

A. *Legal Principles*

1. Section 1172.6

At a section 1172.6 evidentiary hearing to determine a petitioner's entitlement to relief, " 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder [or attempted murder]' under state law as amended by [Senate Bill 1437]. (§ 1172.6, subd. (d)(3).)  'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'  [Citation.]  If murder was charged generically, and the target offense was not charged, the petitioner's 'conviction shall be redesignated as the target offense or underlying felony for resentencing purposes.' " (*People v. Emanuel* (2025) 17 Cal.5th 867, 880–881 (*Emanuel*).)

2. Aiding and Abetting Attempted Murder

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*); see also *People v. Collie* (1981) 30 Cal.3d 43, 62 [" 'Specific intent to kill is a necessary element of attempted murder.  It must be proved, and it cannot be inferred merely from the commission of another dangerous crime.' "]; *People v. Mumin* (2023) 15 Cal.5th 176, 190.)  An intent to kill is shown if the assailant either desires the death of the victim or knows to a substantial certainty that death will occur as the result of the assailant's action.  (*People v. Smith* (2005) 37

Cal.4th 733, 739 (*Smith*).) "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

Although a defendant can no longer be held liable for attempted murder based on the natural and probable consequences doctrine, under current law, "[d]irect aiding and abetting remains a valid theory of attempted murder after the enactment of Senate Bill No. 775." (*People v. Coley* (2022) 77 Cal.App.5th 539, 548; see also *People v. Ervin* (2021) 72 Cal.App.5th 90, 101 ["Liability for intentional, target offenses is known as 'direct' aider and abettor liability; liability for unintentional, nontarget offenses is known as the ' " 'natural and probable consequences' doctrine." ' "].)

For the purposes of direct aider and abettor liability, "[w]hen the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*Lee, supra*, 31 Cal.4th at p. 624; see also *People v. Chiu* (2014) 59 Cal.4th 155, 166–167, superseded by statute as noted in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3 [discussing direct aiding and abetting principles]; *Chiu*, at pp. 171–172 (conc. & dis. opn. of Kennard, J.); *People v.*

*Gentile* (2020) 10 Cal.5th 830, 843, superseded by statute on another ground as stated in *Wilson, supra,* 14 Cal.5th at p. 869 [explaining direct aiding and abetting principles].)

" 'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. . . .  [¶]  . . . [¶]  Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.'  . . . 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054–1055; see also *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529–530 ["Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility."].)  The defendant's knowledge of the perpetrator's purpose and intent to assist must "ar[i]se sometime prior to or during the commission of [the crime]."  (*People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294.)

"As our Supreme Court recently emphasized, liability for aiding and abetting ' "require[s] some affirmative action" ' that assists or encourages the commission of the crime.  [Citation.]  A person present at the scene of a crime–even one who is the criminal's companion, knows a crime is being committed, fails to prevent it, and later expresses approval of it–is not guilty of aiding and abetting the crime if he takes no action to aid or encourage the crime."  (*In re K.M.* (2022) 75 Cal.App.5th 323, 329, italics omitted.)

### 3. Standard of Review

We generally review the denial of a section 1172.6 petition following an evidentiary hearing for substantial evidence. (*Emanuel*, *supra*, 17 Cal.5th at p. 885.) "Under this standard, 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact" ' " ' could find beyond a reasonable doubt that" Villanueva directly aided and abetted attempted murder. (*Ibid.*)

"In applying this test, we . . . presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "We 'must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' " (*Ibid.*) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [trier of fact]'s verdict." (*Ibid.*) "However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

"[W]here there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*); *People v. Rodriguez* (2024) 103 Cal.App.5th 451, 457 (*Rodriguez*) ["To determine 'whether a trial court correctly denied a section 1172.6 petition

23

following an evidentiary hearing, " ' "we review the factual findings for substantial evidence and the application of those facts to the statute de novo." ' " ' "].)

B. *Trial Court's Findings Regarding Direct Aider and Abettor Liability*

In concluding that Villanueva could be convicted of attempted murder under current law as a direct aider and abettor, the trial court stated the following about the evidence presented at the evidentiary hearing:

"Even back in October of 2008, Officer Paredez indicated he went to the [Villanueva]'s home, spoke to [Villanueva]. [Paredez] found gang-related items. He talked about the incident that had happened that had caused him to go to the home. And I guess someone asked [Villanueva] if he banged and . . . he responded with profanity. The other person called him a 'buster.' He responded calling the other person a 'scrap.' Again, these are all indications that someone understands the gang culture.

"There has been more than one incident where people have accused back then [Villanueva] of being a gang member. At that time, he also told the officer that he knew gang members committed homicides, drive-by shootings, fought and committed robberies.

"So it shows his knowledge of the gang culture and what happens in that culture and what gang members do.

"The [c]ourt's going to find that on October 1st, 2010, [Villanueva] was hanging out with someone he knew to be a gang member. After leaving the Quality Market, they both approach the area where the vehicle was parked in front of a residence that was associated with Sure[ñ]os.

"The [c]ourt finds that very relevant, that one doesn't just find themselves lost in a neighborhood in front of a Sure[ñ]o residence.

24

"It's clear to the [c]ourt that there is absolutely no evidence that [Guerrero] or [N.Z.] were gang members. They found themselves at the wrong place at the wrong time, took a girl home. It's probably the gentleman in the car who had gone inside and perhaps other people inside that residence that were associated with the Sure[ñ]o gang and/or gang members.

"But these two gentlemen found themselves outside, and the consequences were dire for them.

"The victim testified, [N.Z.], and there is no reason for him to lie, that both [Villanueva] and Mr. Diaz came down the street, they were walking together. When they got three to four meters from the car, they both left together the sidewalk, acting in concert, and then his friend [Guerrero] was shot.

"They split up at that time. Somehow the victim [N.Z.] gets shot. And the victim is crystal clear that [Villanueva] approached him from the rear of the vehicle. The shooter went the other direction. And that he felt blocked in. He was trying to crawl. His legs were numb. He couldn't feel them, couldn't move. And he was trying to use his arms to get away from the shooter.

"He specifically said . . . Mr. Villanueva was standing where he himself [N.Z.] was trying to move his body, and that he felt [Villanueva] was trying to block him either -- that he felt [Villanueva] was trying to block him and that he was blocked from either direction. Then [Villanueva] and the shooter both ran away together.

"So I do find that the petition should be denied."

C. *Analysis*

We begin our analysis by addressing Villanueva's claim that the trial court erred as a matter of law by misunderstanding the elements of direct

aiding and abetting liability for attempted murder. Although we are not convinced the court erred in that manner, for the reasons set out below (see pt. II.C.2., *post*), we decide the court's application of those elements to find, beyond a reasonable doubt, that Villanueva directly aided and abetted the attempted murder of N.Z. is not supported by substantial evidence.

1. <u>No Misunderstanding of the Legal Standard for Direct Aider and Abettor Liability</u>

Villanueva contends the trial court "misunderstood the elements of direct aiding and abetting attempted murder in two respects: 1) that the actus reus was established by [him] standing two meters away from [N.Z.] in the location he was attempting to crawl *after* he had been shot; and 2) that the mens rea was established by [his] 'knowledge of the gang culture and what happens in that culture and what gang members do.'"

Regarding the actus reus element, Villanueva asserts that his "presence behind the trunk of the car could not have aided or encouraged the shooting that had already occurred." He further asserts that his "action in standing near the [t]runk" could not "have aided or encouraged Diaz in shooting [N.Z.] the second time, as this occurred after Diaz and Mr. Villanueva had run away and reached the street corner." We are not convinced by Villanueva's assertions that the trial court misunderstood the law.

"[P]roof of [direct] aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People*

26

*v. Perez* (2005) 35 Cal.4th 1219, 1225.) "[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea." (*People v. Powell* (2021) 63 Cal.App.5th 689, 712–713 [citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1122].)

The present record does not support Villanueva's first contention that the trial court rested its decision regarding his actus reus on conduct he exhibited after Diaz shot N.Z. for the first time. Villanueva's argument is based on an apparent misinterpretation of N.Z.'s testimony and the court's findings regarding the timing of Villanueva's movement toward the back of the car.

As detailed *ante* (see pt. I.B.1.a.), N.Z. testified that Villanueva and Diaz stepped off the sidewalk into the street at the same time and approached Guerrero on the passenger side (street side) of the car. After Diaz shot Guerrero on that side of the car, Diaz and Villanueva separated, with Villanueva remaining in the street and continuing toward the back of the car and Diaz moving around the front end of the car, toward N.Z. and the sidewalk. When the prosecutor asked N.Z. if Villanueva was coming around the back of the trunk when Diaz shot him, N.Z. answered "Yes." Hence, the evidence demonstrates that Villanueva was in a position near the trunk of the car *before* Diaz shot N.Z. for the first time.

The trial court's findings reflected this sequence of events, particularly its statements that Villanueva and Diaz "split up" after Diaz shot Guerrero and Villanueva "approached [N.Z.] from the rear of the vehicle" while Diaz "went the other direction." On this record, we cannot conclude the court improperly found that the actus reus element was established by conduct occurring after Diaz shot N.Z. for the first time.

Furthermore, even assuming Villanueva only moved into his position behind the car after Diaz first shot N.Z. and the trial court, in turn, relied on that movement in finding the actus reus had been satisfied, there would be no error, as a matter of law, in such a finding on this record. Villanueva's contention that his movement to the back of the car could not have assisted Diaz in shooting N.Z. a second time appears to elide the fact that the attempted murder was not complete upon Diaz's first shot at N.Z.

Although "[i]t is legally and logically impossible to both form the requisite intent and in fact aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164), the attempted murder here continued through the time that Diaz fired at N.Z. for a second time while fleeing the scene. (*People v. Gaines* (2023) 93 Cal.App.5th 91, 127, fn. 26 ["the attempted murder . . . ended no later than when the last bullet was fired and either defendants or the victims left the scene"].) As a matter of law, the trial court could properly have considered Villanueva's positioning behind the car moments before Diaz fired at N.Z. for a second time from near the street corner in deciding whether Villanueva assisted Diaz in perpetrating the attempted murder. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

Regarding the mens rea element for direct aiding and abetting liability, Villanueva asserts the trial court's reliance on his " 'knowledge of the gang culture and what gang members do' suggests that [he] could be guilty of attempted murder merely because he was subjectively aware of a known risk and chose to disregard it." He argues such a showing would only

demonstrate implied malice, not the express malice required for attempted murder.[13]

Our review of the record reveals no indication that the trial court mistakenly relied on a theory of implied malice in finding that Villanueva could be convicted of attempted murder under current law. In final argument to the court, the prosecutor noted the "intent to kill" requirement three times and never mentioned implied malice. Further, the court expressly found that "*with the intent to kill*, [Villanueva] aided, abetted and assisted the actual killer in the commission of the attempted murder." (Italics added.) Additionally, in making statements regarding Villanueva's knowledge of gang culture, the court made no comment or finding suggesting that such knowledge reflected either Villanueva's conscious disregard for life or engagement in life-endangering conduct. Thus, the record does not support Villanueva's assertion that the court misunderstood the mens rea element of direct aiding and abetting attempted murder. "In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361.)

2. No Substantial Evidence To Prove Villanueva Harbored an Intent To Kill

We turn to the question whether there is sufficient evidence in the evidentiary hearing record to support that the prosecution has proved,

---

[13] "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his [or her] conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes, supra*, 14 Cal.5th at p. 988, quoting *People v. Knoller* (2007) 41 Cal.4th 139, 143.) "Implied malice cannot support a conviction of attempted murder." (*Rodriguez, supra*, 103 Cal.App.5th at p. 456.)

beyond a reasonable doubt, Villanueva is guilty of attempted murder under the law as amended by Senate Bill 1437.

Regarding the intent to kill requirement for direct aider and abettor liability, the Attorney General acknowledges there is no direct evidence of Villanueva's intent to kill. Nonetheless, the Attorney General contends the trial court "properly inferred that [Villanueva] acted with the intent to kill based on the totality of the circumstances surrounding the shooting." For the below reasons, we disagree that the evidence is sufficient to support a conclusion beyond a reasonable doubt that Villanueva personally harbored an intent to kill during the commission of the attempted murder of N.Z.

Viewed in the light most favorable to the judgment, the evidence shows that prior to the instant crime, Villanueva had associated with Norteños (including Diaz) for years, had adopted the Norteño gang's culture, knew that gang members frequently possessed weapons and committed shootings and homicides, knew that shootings often occurred on the east side of Salinas, was aware of the rivalry between Norteños and Sureños, and had a cousin who was killed by Sureños in 2006. Additionally, Villanueva acknowledged at the evidentiary hearing that he had previously told a probation officer that N.Z. and Guerrero " 'appeared to be gang members themselves based on the way they dressed and looked.' "

Although motive can be probative of intent (*Smith*, *supra*, 37 Cal.4th at p. 741), on the present record, any inference that Villanueva was motivated to kill N.Z. for gang-related reasons or retribution amounts to mere speculation. Generally, it is unreasonable to infer that gang affiliation "entail[s] an agreement by all of its members . . . to kill rivals." (*People v. Ware* (2022) 14 Cal.5th 151, 170.) Moreover, there is no evidence in this case that Villanueva knew Diaz had a gun as they approached Guerrero and N.Z.,

knew that the Key Street house was connected to the Sureño gang, knew anything about A.L.'s Sureño affiliation, saw A.L. exit N.Z.'s car and enter the house, or believed specifically that Guerrero and N.Z. were affiliated with the Sureños. Under these circumstances, we decide the trial court speculated without foundation when it found that A.L. "and perhaps other people inside that residence that were associated with the Sure[ñ]o gang and/or gang members" were "probably" a motivating factor for Villanueva and Diaz in attacking Guerrero and N.Z.

Regarding Villanueva's and Diaz's actions surrounding the shooting itself, viewed in the light most favorable to the judgment, the evidence establishes that Villanueva and Diaz walked on the sidewalk toward N.Z.'s car, stepped off the sidewalk into the street simultaneously, and together approached Guerrero on the passenger side of the car. Diaz said or shouted " 'East Market, motherfuckers' " and shot Guerrero three times, causing him to fall "instantly," while Villanueva stood close by (near the car's backseat). Next, Diaz quickly walked around the front end of the car while Villanueva continued toward the back (trunk area) of the car, moving into a position within two meters of N.Z. N.Z. believed that Villanueva impeded his ability to get away as Diaz approached N.Z. from the front end of the car. Diaz shot N.Z. and took off running. Villanueva then ran away with Diaz. As they ran, Diaz turned around and fired at N.Z. again. After leaving the scene, Villanueva continued to accompany Diaz, and they disposed of the gun at the friend's house on Dennis Street. Later, during his police interview, Villanueva lied repeatedly about his and Diaz's involvement in the shooting.

Although there is no evidence Villanueva, in fact, knew Diaz was armed as they approached Guerrero and N.Z., once Diaz pulled out a gun, said " 'East Market, motherfuckers,' " shot Guerrero, and moved toward N.Z.,

31

Villanueva undeniably became aware of Diaz's criminal purpose. Nevertheless, upon a careful review of the record, we cannot conclude there is substantial evidence (i.e., evidence that is reasonable, credible, and of solid value) proving, beyond a reasonable doubt, that Villanueva personally harbored an intent to kill N.Z.

Villanueva's movement from the passenger side of N.Z.'s car to the area behind it (to within two meters of N.Z.) is ambiguous conduct that does not support a reasonable inference beyond a reasonable doubt of an intent to kill. In moving behind the car, Villanueva vacated a position on the passenger's side of the car that was close to where Diaz fired at Guerrero. Given that Diaz quickly moved around the front end of the car toward N.Z., Villanueva's fast movement to the back end of the car placed him in a position of relative safety with respect to any shots Diaz fired toward N.Z., who was on the driver's side of his car. Furthermore, N.Z.'s belief that Villanueva was blocking him from getting away from Diaz does not necessarily elucidate Villanueva's mental state in positioning himself behind the car as Diaz made his way around the front end.

Similarly, that 15-year-old Villanueva ran after Diaz (away from the area behind the car) and was with Diaz when he shot at N.Z. a second time does not support a finding that Villanueva intended to kill N.Z. Villanueva's flight after witnessing his older friend quickly shoot Guerrero and N.Z., as well as Villanueva's subsequent false statements to police are explicable and not very illuminating of his mental state before and during the commission of the crime. (See *People v. Anderson* (1968) 70 Cal.2d 15, 32 [Although attempting to coverup a crime by lying "may possibly bear on defendant's state of mind *after* the killing, it is irrelevant to ascertaining defendant's state of mind immediately prior to, or during, the killing. Evasive conduct

shows fear: it cannot support the double inference that defendant planned to hide his crime at the time he committed it and that therefore defendant committed the crime with premeditation and deliberation."]; see also *In re Scoggins* (2020) 9 Cal.5th 667, 679 [explaining that "when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state"]; *Emanuel, supra,* 17 Cal.5th at p. 895 [concluding that the defendant's postflight conduct "reveals little about whether he acted with the requisite state of mind when the shooting occurred"].)

We appreciate that as a reviewing court, we must presume "every fact the [trial court] could reasonably have deduced from the evidence." (*Zamudio, supra,* 43 Cal.4th at p. 357.) Nonetheless, applying that standard of review to this record, we conclude there is no substantial evidence to support the trial court's beyond a reasonable doubt finding that Villanueva harbored an intent to kill N.Z.[14]

### III. DISPOSITION

The order denying Villanueva's Penal Code section 1172.6 petition is reversed and the matter is remanded to the trial court with directions to vacate Villanueva's attempted murder conviction and to resentence him in accordance with Penal Code section 1172.6.

---

[14] Because we conclude the evidence is insufficient to support a finding of Villanueva's guilt of attempted murder and, thus, direct the trial court to vacate Villanueva's attempted murder conviction and resentence him, we need not address Villanueva's additional claim of ineffective assistance of counsel at the evidentiary hearing. (See *People v. Vigil* (2008) 169 Cal.App.4th 8, 16.)

_____

Danner, Acting P. J.

I CONCUR:

_____

Lie, J.

**H051098**
***People v. Villanueva***

WILSON, J., Dissenting.

I agree with the majority that the trial court's decision did not reflect any misunderstanding of the legal standard for direct aider and abettor liability. However, I depart from the majority's conclusion that there was insufficient evidence to support the trial court's finding that the prosecution had proved, beyond a reasonable doubt, that Villanueva directly aided and abetted the attempted murder of N.Z. Therefore, I respectfully dissent from the majority's decision to reverse the trial court's denial of Villanueva's Penal Code section 1172.6 petition. [1]

As the majority acknowledges, when reviewing the denial of a section 1172.6 petition, we examine the entire "record ' " 'in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant] guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) That the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071 [defendant on substantial evidence review "bears an 'enormous burden' "].) In reviewing whether there was substantial evidence to support a trial court's denial of a section 1172.6 petition, " ' " '[w]e resolve neither credibility issues nor evidentiary conflicts . . . .' [Citation.]" [Citation.]' [Citation.]" (*People v. Schell* (2022) 84 Cal.App.5th 437, 442 (*Schell*).) In my view, given the level of deference that this standard of review affords to a trial court's decision, the record reflects that there was

---

[1] Unspecified statutory references are to the Penal Code.

substantial evidence to support the trial court's findings and denial of Villanueva's petition.

The majority primarily focuses on the lack of evidence to support a conclusion or inference that Villanueva harbored the requisite intent to kill. In particular, the majority concludes that because there was no evidence Villanueva: (1) knew Diaz had a gun at the time of the shootings; (2) was aware of any connections between the Key Street home and the Sureño gang; or (3) believed the victims were affiliated with Sureños, "any inference that Villanueva was motivated to kill N.Z. for gang-related reasons or retribution amounts to mere speculation." (Maj. opn. *ante*, at p. 30.) The majority further believes that it was speculation for the trial court to conclude that gang affiliations was a "motivating factor for Villanueva and Diaz in attacking Guerrero and N.Z." (Maj. opn. *ante*, at p. 31.) However, the majority does not appear to fully consider the totality of the evidence received by the trial court which could properly support such conclusions. (See *People v. Clark* (2016) 63 Cal.4th 522, 610 [we must presume on appeal "the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial"].)

Based on the evidence presented at the hearing, Diaz's gang related motivation to kill Guerrero and N.Z., is not reasonably disputed. Both N.Z. and Villanueva testified that Diaz shouted "East Market" immediately before the shooting. The evidence also made clear that Diaz was very proud of his gang affiliation with Norteños and his disdain for Sureños. The question before the trial court was whether such gang related motivation could have been known and shared by Villanueva prior to the attacks. I believe such evidence was presented at the hearing. For example, although Villanueva testified at the hearing that he did not believe N.Z and Guerrero

2

were gang members, he acknowledged on cross-examination that he previously stated (during his probation interview) " '[t]he victims appeared to be gang members themselves based on the way they dressed and looked.' " Considering such evidence, the trial court could properly reach three conclusions. First, this was a gang related attack. Second, Villanueva's statements to the probation officer reflected an admission of his *perception* of the victims' gang affiliations prior to the shooting. Third, now as a testifying witness, and having made such a prior inconsistent statement related to a material fact, Villanueva lacked credibility, and the trial court could properly discount his current denials of such knowledge.

Further, the majority appears to rely on the apparent lack of evidence of Villanueva's knowledge that Diaz had a gun or ever carried a gun before the shooting. (Maj. opn. *ante*, at p. 32.) Again, the court received testimony that would belie such conclusions. Villanueva testified he knew Diaz was a Norteño member, and that once he heard Diaz shout out "East Market", he moved towards N.Z. because he knew "basically what is gonna be happening right now, people are gonna get shot." This begs the question—if Villanueva had never seen Diaz with a gun prior to this allegedly surprising event, why would he assume "people are gonna get shot"? Such testimony makes little sense unless Villanueva actually knew Diaz had a firearm with him prior to the shooting, *and* Diaz was, without any apparent provocation, willing to shoot Guerrero and N.Z. who were simply standing by a car. In fact, Villanueva testified that in the four years preceding the murder and attempted murder, he and Diaz became close friends and were regularly together. He stated that he and Diaz would meet up to smoke, go to parties, and sometimes get into trouble and fights around town. There was also testimony from an interview with Villanueva before the attempted murder of

3

N.Z., where he admitted knowing "that gang members commit drive-by shootings, they commit homicides, they rob people and they fight." Based on the evidence, including the use of Villanueva's own testimony, the trial court could reasonably conclude that Villanueva's claim that he was unaware that Diaz was armed or was prepared to use a firearm at the time of the shooting, was simply not credible.

As the majority correctly states, " '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' . . . 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054–1055.) The trial court was allowed to consider the internal inconsistencies of Villanueva's testimony, along with the other evidence, to reach its conclusion. In viewing this evidence in the light most favorable to the judgment, as we are required to do, I believe the trial court could have reasonably inferred that Villanueva was in fact aware of Diaz's intent to target and kill perceived rival gang members prior to the shooting, and in addition to the reasons explained below, Villanueva's cumulative actions demonstrated he shared that same intent.

Testifying nearly 13 years after the subject shooting, N.Z. recounted the circumstances which led to the murder of his friend Jaime Guerrero and resulted in his permanent paralysis. Specifically, N.Z. testified that as he was walking back to the driver's side of his car, he saw Diaz and Villanueva walking on the sidewalk toward him and the front of his car. When Diaz and Villanueva were about three meters away from the front end of his car, they both left the sidewalk *at the same time* and approached the

4

passenger side of car where Guerrero was standing. N.Z. recalled they were only a meter apart from each other. Prior to shooting Guerrero, one of the men (believed to be Diaz) shouted "East Market." N.Z. saw Diaz shoot Guerrero in the head. He further testified that when Diaz shot Guerrero, "[o]ne went to the front of the car, and the other one who didn't shoot went to the trunk of the car." N.Z. confirmed that Villanueva was "coming around the trunk of the car when" he was shot. As recounted by the majority, N.Z. testified to feeling that Villanueva restricted his (N.Z.'s) movements. N.Z. explained, as related to Villanueva's movement and presence, "I felt that he was like trying to impede, uh, like the movement to try and go." Villanueva was approximately "two meters" away from N.Z. when N.Z. felt that Villanueva was trying to impede his movement during the shooting.

In labeling Villanueva's movement from the passenger's side of the car to the back as "ambiguous," the majority appears to be making a determination as to disputed facts, which I believe falls outside the purview of substantial evidence review. (See *People v. Simpson* (1991) 2 Cal.App.4th 228, 232–233 ["[w]e are obliged to accept the trial court's resolution of disputed facts and its evaluations of credibility if supported by substantial evidence"].) Indeed, the majority's statement that "Villanueva's fast movement to the back end of the car placed him in a position of relative safety with respect to any shots Diaz fired toward N.Z., who was on the driver's side of his car," (maj. opn. *ante*, at p. 32) seems to accept Villanueva's testimony that he was merely trying to move out of the line of fire (as opposed to N.Z.'s view that these actions were an attempt to impede his movement and essentially box him in during the shooting). However, N.Z. did not indicate that Villanueva moved to the back of the car only after Diaz began firing at him; instead, it is reasonable to infer from the testimony that

5

Villanueva had already begun moving towards the back of the trunk (toward N.Z.) by the time Diaz moved to the front of the car and shot N.Z. I concede that N.Z.'s testimony regarding the timing of movements and positions of individuals was imprecise. However, video-like precision is not required for the trial court to make reasonable inferences from the testimony provided. It was the role of the factfinder— here, the trial court—to resolve any conflicts between Villanueva's testimony and N.Z.'s testimony. Therefore, the trial court was not obligated to accept Villanueva's testimony that he was trying to run away and distance himself from the shooting. This is particularly true where, as discussed above, the finder of fact had a basis to question Villanueva's credibility on the witness stand.

I also disagree with the majority's conclusion that "N.Z.'s belief that Villanueva was blocking him from getting away from Diaz does not necessarily elucidate Villanueva's mental state in positioning himself behind the car." (Maj. opn. *ante*, at p. 32.) Although I do not believe the majority is attempting to discredit in any way N.Z.'s genuine belief, such a statement would appear to minimize the relevance of N.Z.'s testimony and the weight the finder of fact could give to this circumstantial evidence of Villanueva's mental state through his physical actions. As the trial court noted in its findings, N.Z. had no reason to lie about his observations or recollection of what happened. Moreover, Villanueva's cumulative actions at the scene can be likened to facts in *In Re Juan G.* (2003) 112 Cal.App.4th 1. In *Juan G.,* a juvenile and his companion approached the victim together, and the companion proceeded to rob the victim while the juvenile remained standing within touching distance of the victim; the companion and the juvenile then fled together on foot. (*Id.* at pp. 3–4.) The appellate court found there was sufficient evidence that the juvenile aided in the commission of a robbery

6

based on him standing next to the direct perpetrator during the offense and within touching distance of the victim, based on the victim's testimony that the juvenile's presence made him feel further intimidated. (*Id.* at p. 5.) The appellate court concluded that based on the juvenile's actions and presence at the scene, the "juvenile court reasonably inferred … he knew of and shared [his companion's] criminal intent, and he aided, promoted, and encouraged the commission of the robbery." (*Ibid.*)

The case before us has significantly more evidence of Villanueva's intent to aid and abet than that found in *Juan G.* In reaching its conclusion, the trial court properly considered the totality of the evidence presented during the evidentiary hearing, including but not limited to: (1) Villanueva's presence at the scene; (2) his lengthy and admittedly close relationship with Diaz at the time of the shooting; (3) Villanueva hearing Diaz shout "East Market" and, according to his testimony, immediately knowing someone was about to get shot; (4) Villanueva's affirmative actions of stepping off the sidewalk in concert with Diaz before Guerrero was shot in the head; (5) Villanueva's movement towards the back of the vehicle in what could reasonably be inferred as a deliberate attempt to stop N.Z. from moving or fleeing at the time of the shooting; (6) his physical proximity to both Diaz and N.Z. as the shooting unfolded (within a meter of Diaz and several meters from N.Z.); (7) the trial court questioning Villanueva's account that he and Diaz arrived in front of a home with Sureño affiliations by accident; (8) Villanueva's prior statement that the victims (Guerrero and N.Z.) appeared to look and dress like gang members; (9) gang expert testimony of the ongoing gang rivalry and Villanueva's history with gangs (through indicia found in his home, his own statements, and gang related fights at school) that would indicate a strong association with and support for Norteños; (10)

7

immediate flight from the scene with Diaz; and (11) prior inconsistent statements to the police after the shooting that he was not in the area, and, after being shown a video with him and Diaz at a nearby store, continuing to deny he and Diaz were involved in the shooting at all.

Therefore, I would have concluded that there was substantial evidence to support the trial court's finding of proof, beyond a reasonable doubt, that Villanueva could still be convicted of attempted murder under current law as a direct aider and abettor. I would have affirmed the trial court's denial of Villanueva's section 1172.6 petition. Accordingly, with respect, I dissent.

_____
WILSON, J.



*People v. Villanueva*
H051098